UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BRENDAN CALDERONE & LINDSAY CALDERONE,

Plaintiffs,

v.

THE FEDERAL SAVINGS BANK, et al.,

Defendants.
---------------------------------------------------------------X

**MEMORANDUM AND ORDER**
25-CV-2647-SJB-ARL

**BULSARA, United States District Judge:**

Plaintiffs Brendan and Lindsay Calderone commenced this action alleging that mortgage lender The Federal Savings Bank ("TFSB"), through its employees John Joseph Sinnes and Tarik Dalal (collectively "Defendants"), fraudulently induced them to refinance their mortgage with the Department of Veterans Affairs ("VA") under the guise of receiving additional benefits that, in actuality, were harmful to them. They assert 27 state law claims, among them claims for fraudulent inducement and negligent misrepresentation. Defendants have moved to dismiss the Complaint in its entirety. (Defs.' Mem. in Supp. of Mot. to Dismiss dated Jan. 16, 2026 ("Defs.' Mot."), Dkt. No. 42-1). For the reasons explained below, Defendants' motion is granted in part and denied in part.

## LEGAL STANDARD

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted). In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

This pleading requirement "does not impose a probability standard at the motion-to-dismiss stage." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 77 (2d Cir. 2025) (noting that plausibility does not equate to probability). And "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that [plaintiff] can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder." *Id.* (quotations omitted).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purpose of this motion, the Court is "required to treat" the Plaintiffs' "factual allegations as true, drawing all reasonable inferences in favor of [Plaintiffs] to

the extent that the inferences are plausibly supported by allegations of fact." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). The Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts." *Id.*

The Calderones purchased their home in Island Park, New York on May 6, 2019 by borrowing $ 503,500 from a non-party mortgage lender. (Second Am. Compl. dated Dec. 23, 2025 ("SAC"), Dkt. No. 32 ¶ 20). The loan was secured by a mortgage on their home that was guaranteed by the VA based on Brendan's status as a U.S. Veteran. (*Id.* ¶¶ 15, 21–22). In the fall of 2020, a now-deceased employee of TFSB contacted the Calderones to inform them that they could refinance their loan and lower their monthly payment. (*Id.* ¶ 23). On December 9, 2020, the Calderones refinanced their 2019 loan by securing a new VA-guaranteed loan in the amount of $ 510,400 with TFSB at a fixed interest rate of 2.25%. (*Id.* ¶ 24).

On October 24, 2023, Sinnes, TFSB's Assistant Senior Vice President, contacted the Calderones via text stating: "I'm actually reaching out because I got a notification that you guys have new VA Benefits available." (*Id.* ¶¶ 18, 34). He described the alleged new benefits as follows:

> The notification we got shows two different benefits. The first is the VA Home Equity Disbursement plan. This aims to eliminate all debts for the Veteran and also get some additional cash left for you as well. The other Benefit is the VA Home Improvement Plan. This aims to get funds for the Veteran to do Upgrades or renovations on the home and also get some additional cash left for you as well.

(*Id.* ¶ 35). Sinnes described the Program as a "VA streamline rate reduction" that would "reduce the payment drastically," as long as mortgage payments were made on time. (SAC ¶ 36). The Calderones allege what Sinnes represented as a federal benefit program consisting of a single transaction that would guarantee a payment decrease was actually two separate credit transactions between private, non-governmental parties.[1] (*Id.* ¶ 79). Sinnes promised that "[t]he best part of the program is that it comes with a payment reduction after 6 payments!" (*Id.* ¶ 142).

Two days later, on October 26, 2023, Lindsay asked Sinnes whether the Program would keep their "mortgage payment at $ 3400 still after the 6 months," to which Sinnes replied "[y]es closer to $ 3200." (*Id.* ¶¶ 37–38). The Calderones then declined to move forward; Sinnes responded, "I can hold it until Monday! These programs don't come along so often! . . . This particular program that comes with the payment reduction won't be [available after Monday]. We only get so many of these from the VA. So we have to act within 4 business days of receiving notification." (*Id.* ¶ 39). The Calderones allege that the VA Streamline Refinance program has been in use since 1980. (*Id.* ¶ 40).

[1] The SAC details the refinancing programs offered through the VA, namely (1) the Interest Rate Reduction Refinance Loan ("VA Streamline Refinance") and (2) the Cash-Out Refinance Loan. (SAC ¶ 26 (citing the VA website page on VA home loan types)). A VA Streamline Refinance allows borrowers to refinance their VA-backed loan into a new VA-backed loan with a lower interest rate, but does not provide access to the property's equity. (*Id.* ¶¶ 27–28). For the Cash-Out Refinance Loans, there are two types: (1) Type I, which allows borrowers to refinance their non-VA-backed loan with a higher interest rate into a VA-backed loan with a lower interest rate, but cannot be used to access a property's equity; and (2) Type II, which is the only financial product offered through the VA that allows borrowers to refinance their loans and take out equity, but does not guarantee a lower interest rate. (*Id.* ¶¶ 29–33).

On October 30, 2023, the Calderones accepted the offer to take $ 70,000 in equity out of their home and enter into the Program. (SAC ¶ 43). When they questioned the documents TFSB shared disclosing the terms of the Program that reflected a 6.6% interest rate and a $ 3,900 mortgage—when they believed it should have been closer to a 3.1% interest rate and a $ 3,000 mortgage—they allege that Sinnes reiterated to them telephonically that the increased rate would only apply for the first six months, after which the Program would kick in and lower the interest rate and monthly payment. (*Id.* ¶¶ 44–45; *see also* 2023 Loan Package, attached to Defs.' Mot. as Ex. 1, Dkt. No. 50 at 6) (stating the loan's term as "30 years" for a "fixed rate")). They closed on the new loan (the "2023 Loan") on November 21, 2023. (SAC ¶ 46).

The principal balance of the 2023 Loan was $ 616,500, consisting of $ 48,198.46 in closing costs, of which the Calderones allege over half was payable directly to TFSB. (*Id.* ¶¶ 47–49). On November 28, 2023, Defendants wired $ 83,784.66 representing the equity withdrawn through the 2023 Loan instead of the $ 70,000 the Calderones had requested. (*Id.* ¶¶ 50–51). The Calderones allege that it benefited Sinnes for them to withdraw more equity as it increased the basis used to calculate his commission. (*Id.* ¶ 53).

After the Calderones made the first six payments, they reached out to Sinnes to ask if the mortgage rate would drop back down to 3.2% or 3.3% with payments between $ 3200 and $ 3300, and he confirmed that it would. (*Id.* ¶¶ 54–55 (Sinnes replying "Yes that is the plan . . . We literally just send new disclosures for you guys to sign with the lower rate & payment.")). After repeated attempts to follow-up with Sinnes, on

September 10, 2024, he informed the Calderones that he could lower their interest rate only to 5.240%. (*Id.* ¶ 58). The Calderones then spoke to several other TFSB agents, including Dalal, expressing their frustration. (SAC ¶ 62). Dalal told them that he would also be upset if he was in the same situation and would do his best to make it better. (*Id.* ¶ 63). Lindsay begged for help, saying her family could not afford the next payment, and Dalal offered them another refinancing, with additional closing costs payable to TFSB. (*Id.* ¶¶ 64–65). The Calderones agreed to refinance, trusting Dalal's statements that if he could "right the wrongs" he would "do it in a second." (*Id.* ¶¶ 66, 68). However, TFSB delayed in closing the third refinance, and Dalal stopped responding to the Calderones altogether as of October 21, 2024. (*Id.* ¶¶ 69–70). That is until 2025, when the Calderones allege that a new TFSB agent reached out to them several times to offer "new benefits" to lower costs and obtain equity, available for only a limited period. (*Id.* ¶ 90).

The Calderones allege that the 2023 Loan: (i) increased the amount of interest they will pay over the life of their loan tenfold;[2] (ii) more than doubled their interest rate; (iii) nearly doubled their monthly mortgage payment; (iv) created more debt than they started with; and (v) decreased their equity in their home. (SAC ¶ 75). They allege that they were tricked into paying $ 48,198.46 to access $ 35,586.20 in equity while increasing the cost of their credit. (*Id.* ¶ 76).

[2] The Calderones allege that under the terms of the original refinanced loan, they were projected to pay approximately $ 172,823.09 in interest, but now, under the 2023 Loan, they are projected to pay almost $ 1.8 million in interest alone. (SAC ¶¶ 60–61).

The Calderones commenced this action on May 12, 2025. (Compl., Dkt. No. 1).[3] The Complaint alleged claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Truth in Lending Act ("TILA"), and several state law claims. (*Id.* ¶¶ 73–248). Defendants filed their first request for a premotion conference on July 25, 2025, to which the Calderones filed an amended complaint in response. (Defs.' Mot. for Premotion Conference dated July 25, 2025, Dkt. No. 20; Am. Compl. dated July 30, 2025, Dkt. No. 21). Defendants renewed their request, and the Court scheduled a premotion conference for September 23, 2025. (Order dated Aug. 21, 2025). From the bench, the Court deemed the motion to have been made and dismissed all the federal claims and declined to exercise supplemental jurisdiction over the state law claims, granting the Calderones leave to file an amended complaint. (Min. Entry & Order dated Sep. 23, 2025).

The Calderones filed their Second Amended Complaint on December 23, 2025. The SAC alleges 27 causes of action, many of which are the same claims based on different representations: (1) nine claims for fraudulent inducement, (*id.* ¶¶ 91–314); (2) fraudulent misrepresentation, (*id.* ¶¶ 315–34); (3) nine claims for negligent misrepresentation, (*id.* ¶¶ 335–558); (4) breach of fiduciary duty, (*id.* ¶¶ 559–81); (5) violation of New York General Business Law ("GBL") § 349, (*id.* ¶¶ 582–91); (6) violation of GBL § 350, (SAC ¶¶ 592–601); (7) negligent supervision, hiring, or

---

[3] The original complaint also named PHH Mortgage Corporation ("PHH") as a Defendant. (Compl. ¶ 17). PHH was terminated from the docket on December 24, 2025 after the Calderones filed their Second Amended Complaint dropping their claims against it. (Order dated Dec. 24, 2025).

retention, (*id.* ¶¶ 602–12); (8) three claims of intentional infliction of emotional distress, (*id.* ¶¶ 613–43); and (9) loss of consortium, (*id.* ¶¶ 644–50). The parties completed briefing on Defendants' motion to dismiss on February 27, 2026. (Defs.' Mot.; Pls.' Mem. in Opp'n to Defs.' Mot. dated Feb. 13, 2026 ("Pls.' Opp'n"), Dkt. No. 42-5; Defs.' Mem. in Reply dated Feb. 27, 2026 ("Defs.' Reply"), Dkt. No. 42-6).[4]

## DISCUSSION

### I. Fraud-Based Claims

The Calderones allege two fraud-based claims: fraudulent inducement and fraudulent misrepresentation. "Claims sounding in fraud must satisfy the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b)." *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022). Under this standard the plaintiff must "(1) detail

[4] After briefing was complete, the Calderones filed a motion to amend their opposition to include an April 2, 2026 consent order between the Office of the Comptroller of the Currency and TFSB. (Pls.' Letter Mot. dated Apr. 27, 2026, Dkt. No. 44). The Court held an in-person conference to address the request on May 13, 2026, and ordered supplemental letters on the matter. (Min. Entry & Order dated May 13, 2026). Given that the Consent Order was not referenced in the SAC—and finding no basis on which to take judicial notice—the Court does not consider it in reaching its decision herein. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) ("In considering a motion to dismiss for failure to state a claim under [Rule 12(b)(6)], a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." (quotation omitted)). Further, the Calderones request that this Court consider the Consent Order for the truth of its contents, namely the OCC's finding that "certain Bank employees made deceptive statements to consumers regarding the terms of the VA cash-out refinance loans," to support their GBL claims. (Pls.' Suppl. Letter dated May 25, 2026, Dkt. No. 48 at 2). This is impermissible. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements [the document] contained—but again not for the truth of the matters asserted." (quotation and emphasis omitted)). The Calderones' motion to amend their opposition is denied.

the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* (quotation omitted). The Court finds the SAC contains sufficient pleading to support a finding of fraud, and as such, the Defendants' motion is denied as to these claims.

**A. Fraudulent Inducement**

To state a claim for fraudulent inducement under New York law, a plaintiff must allege: "(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." *Kainz v. Bernstein*, 841 F. App'x 249, 251 (2d Cir. 2020) (quotation omitted). The Calderones base their fraudulent inducement claims on nine distinct representations Sinnes[5] made to them which they allege induced them to enter into refinancing that worsened their financial situation. The Defendants argue that the SAC fails to sufficiently plead the falsity of the representations and fails to adequately plead causation. (Defs.' Mot. at 9–12). Neither argument is persuasive.

*First*, Defendants contend that the fraudulent inducement claims "entirely fail to plead the falsity or incorrectness of the at-issue representations." (*Id.* at 9). They argue that the SAC fails to explain why each statement is false and instead does so in conclusory fashion. (*Id.* at 10). But an evaluation of each statement reveals specific

[5] The SAC alleges that TFSB is also liable for these claims under a theory of *respondeat superior*. (*See, e.g.*, SAC ¶¶ 103, 128, 153).

allegations as to its falsity. And the SAC provides the requisite who, what, when, and why for each statement to satisfy the Rule 9(b) pleading standards.

Count One is premised on Sinnes's message on October 24, 2023 stating "you guys have new VA benefits available!" (SAC ¶ 92). Count Two relies on Sinnes's follow-up message explaining the nature of the Program as "two different benefits," the first a "VA Home Equity Disbursement plan" to "eliminate all debts" and "get some additional cash" and the second a "VA Home Improvement Plan" that aims to "get funds for the Veteran to do [u]pgrades or renovations." (*Id.* ¶ 117). Defendants argue that there are no allegations to suggest that the benefits referred to or the 2023 Loan were not provided by the VA. (Defs.' Mot. at 10). But the SAC details the various loan products offered through the VA, (SAC ¶¶ 26–33), which do not include a program as described by Sinnes. The Calderones allege that Sinnes represented the Program as a "new" federal benefit program for veterans consisting of a single transaction that guaranteed a payment decrease, but it was actually two separate credit transactions between two private, non-governmental parties: both a Type II Cash Out Refinance to take equity out of the property and a second refinance using a Streamline to lower the interest rate. (*Id.* ¶¶ 79–80). Thus, the SAC sufficiently alleges the falsity of these statements, by explaining that they made representations about a new program and

benefit, that was not in fact new, and was mistitled—and thereby misdescribed the nature of what the Calderones were being offered.[6]

Counts Three and Four are premised on Sinnes's October 24, 2023 text stating that "[t]he best part of the program is that it comes with a payment reduction after 6 payments!" and October 26, 2023 message confirming that the Calderones' payment would be "closer to $ 3200," respectively. (SAC ¶¶ 142, 167). Defendants raise no arguments specific to these statements, but their falsity is evident: the Calderones allege that they did not receive a payment reduction nor did their payment go down to $ 3200 after the six-monthly payments as promised. (*See id.* ¶¶ 57–58, 75). The same is true for Count Nine, which Defendants also did not specifically challenge, in which the Calderones allege that on November 15, 2023, Sinnes spoke to Lindsay telephonically and reassured her that she was entering a program with six months of higher monthly payments after which her payment would lessen back to its original amount. (*Id.* ¶ 292).

Counts Five, Six, Seven, and Eight concern Sinnes's representations on October 27, 2023 that he could "hold [the program] until Monday" but they "don't come along so often," that "[t]his particular program that comes with the payment reduction won't

[6] Defendants, in reply, argue that no falsity is alleged because the Calderones' arguments are contradictory: on the one hand claiming that Sinnes misrepresented the two VA products as one and on the other alleging that Sinnes was not actually talking about any VA products. (Defs.' Reply at 5). But there is no contradiction. The Calderones allege that Sinnes's statements of the offered program were false because he (1) presented it as a new program, as opposed to the apparent use of long-standing VA refinancing programs and (2) conveyed it as one single transaction that could give them all the benefits he presented, when in actuality it required multiple transactions. (*See* SAC ¶¶ 39–40, 79–82, 84)

be [available after Monday]," and that they "only get so many of these [programs] from the VA," and "have to act within 4 business days of receiving notification." (*Id.* ¶¶ 192, 217, 242, 267). Defendants argue that the SAC contains no allegations as to the purported truthful volume and timing of the program's availability, (Defs.' Mot. at 10 n.6), but the SAC alleges that the VA Streamline Refinance was introduced by the VA in 1980 and has been in use since then, (SAC ¶ 40). Defendants' arguments that the product could have ebbs and flows in its availability, (Defs.' Reply at 5), are not suited for the pleading stage where the Court accepts as true the allegation that the product was consistently available.

*Second*, Defendants argue that the SAC fails to plead causation. (Defs.' Mot. at 11). A plaintiff must show "both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Meyercord v. Curry*, 38 A.D.3d 315, 316 (1st Dep't 2007) (quotation omitted). Loss causation "is the causal link between the alleged misconduct and the . . . harm ultimately suffered by the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) (quotation omitted). To establish loss causation, a plaintiff must plead that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (quotation omitted).

The Calderones allege that they entered into the 2023 Loan because of Sinnes's representations—each representation and assurance contributing to their ultimate decision to do so. For example, they allege that even though they expressed concern

that the rates reflected in the refinancing documents were not what they had discussed, Sinnes reassured them that the rates would ultimately come back down. (SAC ¶¶ 44–45). Such statements allegedly caused the Calderones to believe that they did not run the risk of being stuck with higher rates, higher monthly mortgage payments, and more overall debt—which is exactly the harm they allege to have occurred (and damages they seek to recover). (*Id.* ¶¶ 75–76).[7] Defendants' motion as to the fraudulent inducement claims is denied.

**B. Fraudulent Misrepresentation**

The Calderones assert a claim for fraudulent misrepresentation based on Sinnes's omission that the Calderones would have to enter into an additional refinancing transaction. (SAC ¶¶ 315–19). To state a claim for fraudulent misrepresentation under New York law, a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *See Zamora v. FIT Int'l Grp.*, 834 F. App'x 622, 626 (2d Cir. 2020) (quotation omitted).

While the fraud alleged must be stated with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.

---

[7] Defendants rely on *Minzer v. Barga*, where the court found no allegations of loss causation for Uber's alleged misrepresentations of safety given that a driver's attack on the plaintiff, not Uber's representation, was the direct cause of plaintiff's loss. *See* No. 151979/2019, 2020 WL 2621710, at *3 (Sup. Ct. May 22, 2020). Here, there is no such indication of an intervening cause; the Calderones allege that they were harmed by Defendants themselves.

Civ. P. 9(b); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (noting that courts apply a more general standard for scienter "for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind" (quotation omitted)). A plaintiff still has "the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter." *Id.* (quotation omitted). To that end, a plaintiff must allege facts that "give rise to a strong inference" of intent to defraud. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quotation omitted). Such allegations include (a) "facts to show that defendants had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quotation omitted).

Defendants argue that the Calderones rely only on "conclusory allegation[s]" of intent, (Defs.' Mot. at 15), but the Calderones make substantial allegations that Sinnes intended to defraud them, and had a financial incentive to do so. They allege that Sinnes omitted mention of the second, required refinance transaction they were forced to complete, which allowed him to "collect two commissions from the Calderones, rather than one." (SAC ¶¶ 79–81). And they allege that he specifically said that the Program came with a rate reduction, suggesting that a second transaction was not necessary. (*Id.* ¶ 84). The two transactions also allowed even more equity to be taken from the Calderones' property in the form of closing costs payable to TFSB. (*Id.* ¶ 82). And because Sinnes's commission was based on the principal amount financed—including the additional $ 13,784.66 in cash out that the Calderones did not request—it

also benefited Sinnes for the Calderones to withdraw more equity from their home, increasing the basis for Sinnes's commission. (*Id.* ¶¶ 52–53). Sinnes was awarded "Most Volume Funded" for all the loans he originated in 2023 and was subsequently promoted to Senior Vice President of TFSB. (*Id.* ¶¶ 86, 88).

Bolstering the basis on which to infer the necessary intent, is the quantity and nature of the misrepresentations made by Sinnes. For example, he allegedly misrepresented how long the Program would be available, despite the VA program being longstanding. (*Id.* ¶¶ 39–40). He also affirmatively answered "yes" when Lindsay asked whether the mortgage payment would decrease after six months, (SAC ¶¶ 37–38, 45), despite the unlikeliness of such a decrease based on interest rates in the market at the time, (*see id.* ¶¶ 56–57 (alleging that as of June 20, 2024, the rate for a 30-year, fixed rate mortgage was 6.87%)). They allege that "Sinnes knew the Calderones did not have all of the information needed to make an informed decision on whether to enter the Program" and that he omitted these facts "with the intent to defraud" them. (*Id.* ¶¶ 317–18). Additionally, Sinnes ceased communicating with the Calderones once the realities of the Program became clear. (*See id.* ¶ 58 (alleging that Sinnes delayed in following up with them when the interest rate did not decrease after the six-month period)). These allegations reflect a pattern of misrepresentations over a period of time that cannot be passed off as mere negligence and is more than enough to raise an inference of fraudulent intent.

Defendants' motion as to the fraud-based claims is denied.

## II. Negligent Misrepresentation

The Calderones also assert, in the alternative, nine claims of negligent misrepresentation based on the same statements at issue in the fraudulent inducement claims. (*See* SAC ¶¶ 336, 361, 386, 411, 436, 461, 485, 510, 535). To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quotation omitted). The Calderones' claims fail at the first step as there is no special relationship alleged between the parties. The "duty" or "special relationship" element of negligent misrepresentation limits such claims to "situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity." *Id.* (quotation omitted). In the context of commercial transactions "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996).

TFSB is a mortgage lender, Sinnes a loan officer, and the Calderones are borrowers who refinanced a loan with Defendants. (*See* SAC ¶¶ 1, 17, 18, 46). In general, such "an arm's length borrower-lender relationship does not support a cause of action for negligent misrepresentation," because the requisite duty is absent. *Greenberg,*

*Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 578 (2011) (quotation omitted) (explaining that there is no special relationship between borrower and lender even if "there is a long-standing relationship between the customer and a particular bank employee" or "if the parties are familiar or friendly" (quotation omitted)). Therefore dismissal is appropriate. *E.g.*, *Rutkowski v. First Horizon Home Loans*, 117 A.D.3d 1265, 1266 (3d Dep't 2014) (affirming dismissal where complaint did not "allege facts establishing a relationship between the parties other than an ordinary mortgage loan transaction").

The Calderones attempt to create a special relationship based upon the superior knowledge allegedly held by Defendants. (Pls.' Opp'n at 17–18).

In the commercial context, courts have found that "a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience the one has the right to rely on upon the other for information.'" *NCR Corp. v. B.A.T. Indus. P.L.C.*, No. 23-CV-1172, 2024 WL 4188358, at *12 (S.D.N.Y. Sep. 14, 2024) (quoting *Kimmell*, 89 N.Y.2d at 263). Courts consider the following factors in determining whether a duty exists: (1) whether the defendants "held or appeared to hold unique or special expertise;" (2) whether there is a special relationship of "trust or confidence" between the parties; and (3) whether the "speaker was aware of the use to which the information would be put and supplied it for that

purpose." *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *8 (S.D.N.Y. Oct. 26, 2016) (quoting *Kimmell*, 89 N.Y.2d at 263).[8]

A lender-borrower relationship is not a special or unique one that would qualify for a duty to disclose. *See Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 608 (S.D.N.Y. 2013) ("[A] standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation." (quotation omitted)); *see also Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2014 WL 4677120, at *15 (E.D.N.Y. Sep. 19, 2014) (finding plaintiff's allegations that defendant solicited plaintiff to apply for a loan modification, indicated her eligibility for modification programs, requested plaintiff send various documents, and assigned plaintiff "relationship managers" did not suggest an atypical relationship). The Calderones have failed to otherwise allege that Sinnes had the requisite unique or specialized expertise to impose and infer a duty.

The Calderones rely on the third factor, arguing that Defendants knew that the Calderones would act under the mistaken knowledge that they were entering into a

---

[8] The Calderones cite to *NCR Corporation* to argue for treatment under the "special facts doctrine." (*See* Pls.' Opp'n at 17). However, the quoted language pertains to the court's analysis of a fraud claim based on nondisclosure. *See NCR Corp.*, 2024 WL 4188358, at *10 ("Under [the special facts] doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." (quotation omitted)); *see also Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 155–56 (2d Cir. 1995) (analyzing a duty to disclose material information for a fraudulent concealment claim). And the court explained that "New York law appears to treat differently the special facts doctrine applicable to a fraud claim and the duty required as an element for negligent misrepresentation, likely because casual statements and contacts are prevalent in business, and thus a comparatively stricter duty limitation must be imposed to avoid expanding negligence liability." *NCR Corp.*, 2024 WL 4188358, at *13 n.7 (quotation omitted).

program that would benefit them. (*See* Pls.' Opp'n at 18). But even so, it is insufficient on its own to establish a special relationship beyond that of a typical borrower and lender. *See Eternity Glob. Master Fund*, 375 F.3d at 188 ("[W]here, as here, a 'special relationship' is nowhere pled, and the allegations with respect to the other *Kimmell* factors are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6)."); *e.g.*, *JTRE Manhattan Ave. LLC v. Capital One, N.A.*, 585 F. Supp. 3d 474, 481 (S.D.N.Y. Feb. 9, 2022) ("[S]atisfaction of this [reliance] factor alone is not a lifeline onto which Plaintiffs' negligent misrepresentation claim can viably cling.").

The Calderones' claims for negligent misrepresentation are dismissed.

**III. Negligent Supervision**

To state a claim for negligent supervision or retention, in addition to the negligence elements of such a claim, a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *See Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019) (quotation omitted). The employee also "must not be acting within the scope of his or her employment; for in that situation the employer would only be liable vicariously under the theory of *respondeat superior*, and not for negligent supervision or retention." *Id.* at 129–30 (quotation omitted). An employee acts within the scope of their employment when "doing his master's work," but acts outside of it when acting for "wholly personal motives." *Id.* at 130 (quotations omitted).

Here, the SAC repeatedly alleges that Sinnes and Dalal were acting within the scope of their employment. (*See e.g.*, SAC ¶¶ 19, 62, 65–66 101, 102–11, 151, 176, 201, 226, 251, 603–04). But not once does the SAC make any allegation that Sinnes and Dalal were acting outside the scope of their employment, as all of their allegations point to Sinnes and Dalal acting in their capacity as TFSB employees. The Calderones request further leave to amend to specify that the claim is plead in the alternative[9] and to state that the acts were committed "outside the scope of Sinnes' and Dalal's employment." (Pls.' Opp'n at 24). But such an amendment would not resolve the issue as it would amount simply to a conclusory allegation that could not support the claim. Therefore, the claim for negligent supervision is dismissed. *See, e.g.*, *La Liberte v. Reid*, No. 18-CV-5398, 2023 WL 6593985, at *8 (E.D.N.Y. Aug. 18, 2023) (rejecting plaintiff's attempt to conflate a claim for negligent hiring and supervision with a claim of *respondeat superior* because complaint only alleged that defendant was acting within the scope of her employment) (collecting cases), *report and recommendation adopted*, 2023 WL 6370772, at *1 (Sep. 30, 2023); *Doe v. Indyke*, 465 F. Supp. 3d 452, 468–69 (S.D.N.Y. 2020) (dismissing negligent supervision claim as insufficiently pled where plaintiff relied on allegations under the theory of *respondeat superior* but otherwise provided no support for negligent supervision).

---

[9] The Calderones rely on *Zeranti v. United States* to argue that courts permit the alternative pleading of negligent supervision. *See* 358 F. Supp. 3d 244 (W.D.N.Y. 2019). But the court in *Zeranti* allowed both claims to proceed because some aspects of the defendant's conduct fell "within the scope of her employment—giving rise to vicarious liability—and other aspects . . . occurred outside the scope of her employment—on which a negligent supervision claim could be based." *Id.* at 260 n.10. No such allegations are found here.

## IV. Breach of Fiduciary Duty

Under New York law, claims for breach of fiduciary duty require a plaintiff to plead: (1) "the existence of a fiduciary duty;" (2) "a knowing breach of that duty;" and (3) "damages resulting therefrom." *Zamora*, 834 F. App'x at 629 (quotation omitted). Here, the SAC fails at the first step as there are no allegations showing the existence of an actionable fiduciary duty.

In considering whether a fiduciary relationship exists under New York law, courts consider "whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Iannuzzi v. Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 137 (E.D.N.Y. 2010) (quotation omitted). As discussed in the context of the negligent misrepresentation claims, *supra* pp. 17–19, lender-borrower relationships are typically not found to create such a duty. *See also Iannuzzi*, 727 F. Supp. 2d. at 138 ("New York courts have held that a fiduciary duty generally does not exist between mortgage brokers and borrowers." (collecting cases)).

The Calderones argue that the interactions with Sinnes went beyond an arms-length transaction given entreaties and use of words that hid the true nature of the loan. (Pls.' Opp'n at 20–21). Under New York law, a lender-borrower relationship may give rise to a fiduciary duty if the "borrower places such confidence and trust in the lender that it invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility." *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-CV-7840, 2020 WL 5751195, at *13 (S.D.N.Y. Sep. 25, 2020) (quotation

omitted). The Calderones claim that Sinnes "took the mantel of financial advisor" by expressing thoughts on the best options and communicating after-hours and on weekends. (Pls.' Opp'n at 20–21). But such allegations are insufficient to transform the standard lender-borrower relationship into a fiduciary one. *See, e.g.*, *Klein v. Finwise Bank*, No. 24-CV-6854, 2026 WL 891582, at *7 (E.D.N.Y. Apr. 1, 2026) (rejecting plaintiff's conclusory allegations that a special relationship existed because of defendant's superior knowledge and expertise as to the nature of the loans); *Iannuzzi*, 727 F. Supp. 2d at 138 (rejecting argument that a borrower places trust and confidence in a lender as it "would effectively make virtually every lender a fiduciary of its borrower"). The Calderones have therefore failed to allege the existence of a fiduciary relationship and the claim is dismissed.

**V. New York General Business Law Claims**

The Calderones also allege that Defendants violated GBL §§ 349 and 350 by inducing prospective borrowers, like them, to transact business with TFSB based on misrepresentations. (SAC ¶¶ 586, 595). The Calderones here plausibly allege violations under both sections, and Defendants motion to dismiss these claims is therefore denied.

GBL Section 349 "provides that '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are . . . unlawful.'" *Venticinque v. Back to Nature Foods Co., LLC*, No. 23-1236, 2024 WL 3385136, at *1 (2d Cir. July 12, 2024) (quoting N.Y. Gen. Bus. Law § 349(a)). And Section 350 "prohibits '[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service.'" *Id.* (quoting N.Y. Gen. Bus. Law § 350). To state a

claim under these statutes, a plaintiff must "show that the defendant engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023) (quotation omitted).

Defendants attack both GBL claims on a single ground—challenging whether the communications sent to the Calderones were consumer-oriented. (Defs.' Mot. at 17). The challenge fails at this stage of the case—the allegations are sufficient to infer that the communications received were intended to or were in fact sent to other consumers, and were not bespoke message sent only to these plaintiffs. The New York Court of Appeals has explained that "an act or practice is consumer-oriented when it has a broader impact on consumers at large. For example, the consumer-oriented element precludes a General Business Law § 349 claim based on private contract disputes, unique to the parties." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 177 (2021) (quotations and citations omitted). "The consumer-oriented standard is liberally construed," *see In re RetailMeNot Browser Extension Litig.*, 825 F. Supp. 3d 329, 359 (S.D.N.Y. 2026), and "the battle over whether plaintiff can meet her obligation of a 'threshold showing that her claim was predicated upon a deceptive act or practice that was consumer oriented' is best reserved for a motion for summary judgment after discovery." *Skibinsky v. State Farm Fire & Cas. Co.*, 775 N.Y.S.2d 200, 201–02 (3d Dep't 2004) (cleaned up) (quoting *Egan v. N.Y. Care Plus Ins. Co.*, 716 N.Y.S.2d 430, 432 (3d Dep't 2000)).

The Calderones have established that the conduct at issue is plausibly consumer-oriented. On October 24, 2023, Sinnes sent a text message to the Calderones stating he was "reaching out because [he] got a notification that [the Calderones] have new VA Benefits available[.]" (SAC ¶ 34). He proceeded to provide general information about the new programs, and when the Calderones declined, told them he could "hold it until Monday! These programs don't come along often! I'll reach out then[.]" (*Id.* ¶¶ 35–39). That comment alone—the suggestion of participation in a set of preexisting programs—suggests that Sinnes was simply including the Calderones in offers made to the general public. Six days after receiving the initial contact from Sinnes, on October 30, 2023, the Calderones "accepted Sinnes's offer to take out $ 70,000 of equity out of their home and enter into the Program." (*Id.* ¶ 43).

In April and May 2025, the Calderones again received similar unsolicited email and text messages from other TFSB employees reaching out because of new "important notifications" regarding their benefits. (*Id.*). Although the 2025 messages did not induce the Calderones to act, they provide plausible evidence that the texts and other contacts the Calderones received in 2023 were routinely sent by Defendants to mortgage holders. The messages appear to be versions of form messages, using similar language in the originating messages in 2023 and 2025, (*compare id.* ¶ 34 *with id.* ¶ 90), and similarly encouraging the Calderones to act fast before the benefits expire (*see id.*). "The record indicates that defendant Bank dealt with [plaintiff] as any customer . . . [using] standard documents presented to customers." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995); *see Himmelstein, McConnell*, 37

N.Y.3d 169 at 178 ("[D]efendant's conduct is not unique to the parties before us. . . . [D]efendant sold it to a robust consumer base . . . defendant relies on a form contract with its customers.").[10]

Defendants' motion to dismiss as to the GBL claims is denied.[11]

## VI. Intentional Infliction of Emotional Distress

Lastly, the Calderones assert three causes of action for intentional infliction of emotional distress ("IIED") premised on (1) Sinnes knowingly inducing a veteran and his young family to enter into an unstable financial transaction, (2) Dalal failing to report Sinnes's predatory actions, charging additional closing costs and fees (including a commission for himself) to refinance the 2023 Loan, and ignoring the Calderones' repeated pleas for help, and (3) TFSB failing to supervise and train its employees to avoid predatory lending practices or address Sinnes's actions. (SAC ¶¶ 614, 625–27, 635–36). To state a claim for IIED under New York law, a plaintiff must plausibly allege: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe

---

[10] Unlike *Seller v. Citimortgage, Inc.*, which Defendants rely on, *see* (Defs' Mot. at 18), Defendants here solicited Plaintiffs—the plaintiffs in *Seller* approached Citimortgage seeking a loan modification and, after providing their unique circumstances, were given allegedly deceptive advice. *Daniel v. Citimortgage, Inc.*, No. 652001/2011, 2013 WL 6162982, at *2 (N.Y. Sup. Ct. Jan. 29, 2013) ("In January 2009, they contacted Citi seeking to reduce their monthly mortgage[.]"), *aff'd sub nom*, *Seller v. Citimortgage, Inc.*, 118 A.D.3d 511 (2014).

[11] Defendants move to dismiss the claim for loss of consortium based on the dismissal of the other 24 claims. (Defs.' Mot. at 23). Given the survival of the fraud and GBL claims, and having been provided no other basis to dismiss the consortium claim, the motion to dismiss this claim is denied.

emotional distress." *Levin v. Am. Document Servs., LLC*, 828 F. App'x 788, 792 (2d Cir. 2020) (quotation omitted).

The Calderones allege that the Defendants' conduct caused Lindsay "severe emotional distress," including "sleep disturbance, nightmares, depression, and long-term anxiety." (SAC ¶¶ 619, 630, 640). Defendants do not contest that Lindsay may have experienced such emotional distress, but they argue that the allegations do not satisfy the first element of "extreme and outrageous conduct." (Defs.' Mot. at 20–22). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). This conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993) (quotation omitted) (noting that the requirements of an IIED claim are "rigorous, and difficult to satisfy" (quotation omitted)). Even "[a]ctions likely to be considered reprehensible by most people are not sufficient." *DiRuzza v. Lanza*, 685 F. App'x 34, 37 (2d Cir. 2017) (quotation omitted).

Assuming the truth of the fraudulent and coercive behavior Defendants allegedly engaged in, courts have found similar, and in some ways, worse conduct to not reach the required level. *See, e.g.*, *Assocs. First Cap. v. Crabill*, 51 A.D.3d 1186, 1188–89 (3d Dep't 2008) (finding threats of foreclosure, misrepresentations as to the amount owed, and stress resulting from the ongoing mortgage dispute did not meet the requirements for IIED). The Calderones provide no authority for extending the tort to

their circumstances, and the Court finds none. *See Hourani v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 142, 149 (E.D.N.Y. 2016) (intentional infliction of emotional distress claim failed where debtor-mortgagor did "not allege, for example, physical threats, verbal abuse, harassment, intimidation, or public humiliation").[12] As such, the IIED claims are dismissed.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is granted in part and denied in part. Defendants' motion is denied as to the fraudulent inducement and misrepresentation claims, violations of the GBL, and the derivative loss of consortium claim, but is otherwise granted as to all other claims. The Calderones' claims for negligent misrepresentation (Counts 11–19), breach of fiduciary duty (Count 20), negligent supervision, hiring, or retention (Count 23), and IIED (Counts 24–26) are dismissed. These claims are dismissed with prejudice and without leave to replead given that the Calderones have now twice amended their initial allegations. *See Sprague v. Salisbury Bank & Tr. Co.*, 969 F.3d 95, 101 (2d Cir. 2020) ("'Repeated failure to cure

[12] Moreover, even if the conduct were considered "extreme and outrageous," the Calderones have failed to allege that Defendants intended to cause such distress. *See Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) ("The conduct must also be intentionally directed at the plaintiff and lack any reasonable justification.").

deficiencies by amendments previously allowed' is a valid reason to deny leave to amend.") (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

SO ORDERED.

*<u>/s/ Sanket J. Bulsara</u>*
SANKET J. BULSARA
United States District Judge

Date: September 16, 2026
Central Islip, New York